**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **BETTY ELAINE DUKE,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **5:15-CV-00558-KOB** |
| **CAROLYN W. COLVIN,** | ) | |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On September 24, 2012, the claimant, Betty Duke, applied for supplemental security

income.  (R. 26).  The claimant alleged disability commencing on February 14, 2011 because of

injuries from a car accident, periodic numbness in the left side, pancreatitis, post-traumatic stress

disorder (PTSD), neck and back pain, cysts in breasts, and a learning disability.  (R. 76, 92, 159).

The Commissioner denied the claims initially on November 28, 2012.  (R. 26).  The claimant

filed a timely request for a hearing before an Administrative Law Judge, and she held a hearing

on July 7, 2013.  (R. 43).

In a decision dated August 26, 2013, the ALJ found that the claimant was not disabled as

defined by the Social Security Act and, thus, was ineligible for supplemental social security

income.  (R. 38).  On February 24, 2015, the Appeals Council denied the claimant's request for

review; consequently, the ALJ's decision became the final decision of the Commissioner of the

Social Security Administration.  (R. 1).  The claimant has exhausted her administrative remedies,

1

and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3).  For the reasons stated below, this court REVERSES and REMANDS the decision of the Commissioner.

## II.  Issue Presented

Whether the ALJ erred as a matter of law in failing to assess whether the claimant meets Listing 12.05 in light of a full scale IQ score of 59.

## III.  Standard of Review

The standard for reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and substantial evidence supports the factual conclusions.  *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No … presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims."  *Walker*, 826 F.2d at 999.  This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions, … but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability."  20 C.F.R. §§ 404.1527(d), 416.927(d).

Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). To make this determination the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

The Eleventh Circuit has determined that for a claimant to be disabled under Listing 12.05,

[a] claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22. Generally, the claimant meets the criteria for presumptive disability under section 12.05(B) when the claimant presents a valid IQ score of 59 or less, or under section 12.05(C) when the claimant presents a valid IQ score of 60 through 70 inclusive, and when the claimant presents evidence of an additional mental or physical impairment significantly affecting claimant's ability to work.

*Crayton v. Callahan*, 120 F.3d 1217, 1219-20 (11th Cir. 1997).

The Eleventh Circuit, however, also has determined that an ALJ is not required to base a finding of mental retardation on the results of an IQ test alone when he evaluates whether a claimant meets the requirements of Listing 12.05.  *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986); *see also Strunk v. Heckler*, 732 F.2d 1357, 1360 (7th Cir. 1984) (finding that no case law "requir[es] the Secretary to make a finding of mental retardation based *solely* upon the results of a standardized intelligence test in its determination of mental retardation"); *see also Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (finding that a valid IQ score need not be conclusive of mental retardation when the IQ score is inconsistent with other evidence in the record concerning the claimant's daily activities and behavior).  An ALJ is required to base her determination of mental retardation on the combination of intelligence tests and the medical report. ALJs evaluate intelligence tests "to assure consistency with daily activities and behavior."

4

*Popp*, 779 F.2d at 1499.  If intelligence tests are inconsistent with the medical record and/or the claimant's daily activities and behavior, good reason exists for an ALJ to discredit intelligence tests.  *Popp*, 779 F.2d at 1500.

## V. FACTS

The claimant has a tenth grade education and was thirty-eight years old at the time of the administrative hearing.  (R. 47).  Her past work experience includes employment as a waitress and a cashier.  (R. 36).  The claimant alleges that she cannot work because of a 2011 auto accident, periodic numbness in her left side, pancreatitis, PTSD, neck and back pain, cysts in breasts, and a learning disability.  (R. 76, 159).  She alleges an onset date of February 14, 2011, the date of the auto accident.  (R. 76, 159, 337).

### *Physical Limitations*

On February 14, 2011, the claimant "t-boned" another vehicle and went to the Emergency Department of Cullman Regional Medical Center for injuries to her right knee, back, and neck. (R. 342, 410).  The claimant received radiology assessments for her chest, head, cervical spine, thoracic spine, lumbar spine, pelvis, and right knee that showed no abnormalities except for a degenerative disease in the thoracic spine and mild subsegmental atelectasis in the chest.  (R. 345-352).  Dr. Timothy Talbot diagnosed the claimant with MVA, a neck spasm, and knee effusion on February 16, 2011 and prescribed Ibuprofen and Lortab for the pain.  (R. 358).

The claimant returned to the Cullman Regional Medical Center Emergency Department on March 15, 2011 complaining of neck and knee pain.  (R. 364).  Dr. Tom Ashar prescribed Lortab for the pain.  (R. 367).  The claimant  returned on April 7, 2011 complaining of a severe headache, and Dr. Greg Barucki diagnosed her with a headache and chronic pain syndrome.  (R.

376).

The claimant visited Hartselle Medical Center reporting abdominal pain on April 22, 2011.  (R. 236-238).  She indicated that her pain was a ten on a scale of one to ten.  (R. 238).  She received a preoperative diagnosis of acute pancreatitis and mild gastritis.  (R. 248).  The claimant received a gastroscope and multiple biopsies that were later found to be benign.  (R. 248-250).  The hospital discharged her on April 23, 2011 after she noted that she felt much better.  (R. 254).

On May 7, 2011, the claimant sought medical care from Dr. Muhammad W. Ali for lower back pain, neck pain, and numbness in the right leg and knee.  (R. 542).  She returned for follow-up appointments on September 9, 2011 and October 28, 2011.  (R. 539, 545).  Dr. Ali discharged the patient from his care on an undisclosed date for her "pill count being off by more than 7 days."  (R. 548).  The claimant "admitted to over taking medications."  (R. 548).

On July 25, 2011, the claimant returned to the Emergency Department at Cullman Regional Medical Center with intense pain.  (R. 382).  Dr. Bill Vermillion diagnosed the claimant with depression and chronic pain syndrome.  (R. 385).

The claimant received a lumbar MRI and cervical MRI at Open MRI of Jasper upon Dr. Ali's referral on November 15, 2011.  (R. 263-264).  The lumbar MRI indicated a small central disc protrusion without definite nerve root impingement and a broad central disc herniation.  (R. 263).  The cervical MRI revealed a disc protrusion with "subtle ventral flattening of the cord ... with mild left neural foraminal narrowing."  (R. 264).

On November 10, 2012, Dr. Victor DeLoach examined the claimant at the request of Disability Determination Services.  (R. 410).  Dr. DeLoach stated that the claimant had a positive

6

straight leg test; decreased range of motion of her cervical and lumbar spine; and normal

ambulation including the ability to walk on her heels, walk heel-to-toe, and do a one third squat.

(R. 413).

*Mental Limitations*

Regarding intellectual disability, a memo from Cullman City Schools indicated no

Special Education Records found on the claimant's behalf.  (R. 422).  The claimant's Withdrawal

Report from Cullman High School shows her enrollment in "Ind English," "Ind Math," "Ind

Social Studies," and "Ind Science."  (R. 423).[1]  Her permanent record shows enrollment in "Ind

English," "Ind Alabama History," "Ind Math," and "Ind Life Science" in ninth grade, as well as

poor grades in general classes in tenth grade.  (R. 425).

The claimant presented to Cullman Regional Medical Center complaining of depression

and chronic pain on July 25, 2011.  (R. 387).  The claimant told RN Patrick Harbison that she

was not going to hurt herself, but also stated that she had thoughts of suicide to end the pain of

the previous evening.  (R. 386).  Dr. Bill Vermillon prescribed Lortab for the pain.  (R. 385).

On August 31, 2011, the claimant received a psychological assessment from Mental

Healthcare of Cullman after complaining of struggles with depression and anxiety since the

February 14, 2011 car accident.  Phillip Morgan, a licensed clinical social worker, had the client

agree to a verbal no harm contract because of her history of suicidal ideation.  (R. 526).

The claimant participated in a clinical interview with Dr. John R. Haney at the request of

---

[1] "Ind" could refer to some sort of intellectual disability, *e.g.*,
http://www.fldoe.org/academics/exceptional-student-edu/ese-eligibility/intellectual-disabilities-in
d.stml (last visited July 18, 2016) (showing that the Florida Department of Education uses "Ind"
to reference Intellectual Disabilities).

the Disability Determination Service on November 12, 2012.  (R. 414, 415).  Dr. Haney noted that the claimant was a poor historian who gave information the "best she could with some encouragement."  He noted that she claimed to not remember well since the February 14, 2011 automobile accident.  (R. 415).  Dr. Haney diagnosed the claimant with major depressive disorder, recurrent, moderate, with suicidal ideation and with a personality disorder.  (R. 416).  Dr. Haney also found that the claimant's ability to function in most jobs appeared to be "moderately or severely impaired" because of her physical, emotional, and vocational limitations.  (R. 416).  He also noted that the claimant had not taken any medication since October 2011, though she had a prescription for Celexa.  (R. 415)

On November 28, 2012, Dr. Robert Estock reviewed the claimant's medical records and evaluated his Mental Residual Functional Capacity for the Disability Determination Service.  (R. 86).  Dr. Estock found no significant limitations in the claimant's ability to understand and remember simple instructions and moderate limitations in remembering detailed instructions.  (R. 86).  He also found no significant limitations in carrying out simple instructions, moderate limitations in carrying out detailed instructions, moderate limitations in maintaining attention and concentration for extended periods, and moderate limitations in being distracted by co-workers working in close proximity.  (R. 86-87).  Regarding the claimant's social interaction limitations, Dr. Estock found that the claimant has moderate limitations in interacting appropriately with the general public, responding appropriately to criticism from supervisors, and getting along with peers without being distracted or "exhibiting behavioral extremes."  (R. 87).  Finally, regarding the claimant's individual adaption limitations, Dr. Estock found that the claimant has moderate limitations in the ability to respond to changes in the work setting, in setting goals, and in making

plans independently of others.  (R. 87-88).

On March 6, 2013, the claimant visited the Cullman Regional Medical Center with homicidal and suicidal thoughts.  (R. 431).  Desiree Washburn, a nurse practitioner, diagnosed the claimant with homicidal, suicidal, hallucination, and delusions, as well as Psychiatric NOS. (R. 433).  The claimant said, " I just want to line my family up and shoot them and then kill myself."  (R. 435).  She also had hallucinations of "people standing behind the doors."  (R. 435).

Dr. Sayed R. Aftab accepted the claimant for treatment of increasing depression and suicide ideation with a plan on March 6, 2013 at The Sanctuary at the Woodlands.  (R. 431).  Her chief complaint was " I just wanted to kill my family and then myself."  (R. 455).  The claimant expressed that she was depressed and stressed after her mother "kicked her out" of the house three weeks prior to admission.  (R. 455).

On March 7, 2013, Dr. Aftab evaluated the claimant, who denied thoughts of killing her family members.  (R. 455-457).  Dr. Aftab stated that the claimant was alert, oriented, and cooperative.  (R. 457).  He observed that she had a depressed and stressed mood.  (R. 457).  The claimant stated that she was safe and did not want to hurt anyone.  (R. 457).  Dr. Aftab assessed her with a GAF of 30, indicating behavior considerably influenced by delusions or hallucinations, serious impairment in communication or judgement, or inability to function in almost all areas.  (R. 33 n.1, 457).  He prescribed Prilosec, Celexa and Seroquel.  (R. 458).  A nurse practitioner, Ms. Windy Boatwright, indicated the claimant should take ibuprofen for neck and back pain, which the claimant described as a ten on a scale of one to ten.  (R. 460).  Ms. Boatwright also indicated that the claimant had a flat affect, no grimacing, and "no physical signs or symptoms of pain during the assessment."  (R. 460).

9

Dr. Greg Swanner completed a Psychological Evaluation Report for the claimant's stay at The Sanctuary at the Woodlands on March 13, 2013, the day of her discharge. (R. 446-454). Dr. Swanner noted that the claimant communicated a prior suicide attempt of cutting her wrists as a teenager in his report. (R. 447). He also noted the claimant's statement during an interview on March 8, 2013 that she saw a shadow of a figure that seemed to glow on a few occasions before being admitted to The Sanctuary at the Woodlands. (R. 449). The claimant was alert, oriented, friendly, and cooperative during her interview. (R. 449). The claimant indicated that her brother committed suicide in 2009 and that her sister and mother have both attempted suicide in the past. (R. 448). She reported that she felt less angry and stressed than she did on March 6, 2013, the date of her admittance. (R. 449). The claimant did not demonstrate difficulty with attention or concentration during the interview. (R. 450).

Dr. Swanner also noted that the claimant completed a Personality Assessment Inventory (PAI) on March 11, 2013. (R. 446). Dr. Swanner indicated that he scored the PAI and found it invalid because of inconsistent responses. (R. 451). Dr. Swanner did not indicate the specific inconsistencies in his report. (R. 451).

Dr. Swanner indicated that the claimant appeared to be only mildly or moderately depressed upon her dismissal on March 11, 2013. (R. 451). He reasoned that her admission to The Sanctuary at the Woodlands, medication, and lack of contact with her family lowered her stress. (R. 451). Dr. Swanner noted that he was unsure whether the visions were true hallucinations or misinterpretations of shadows. (R. 452). He noted that the claimant's description of her childhood may point to "antisocial and perhaps mildly borderline personality traits." (R. 452). Dr. Swanner stated that he was not able to obtain enough information to meet

10

the criteria for a specific disorder during the interview.  (R. 452).

Dr. Swanner noted that the claimant appeared to be stable without significant levels of depression based on his brief interactions with her on March 11, 2013.  (R. 453).  He recommended continuing the medication that Dr. Aftab prescribed and supported the claimant's plan to stay away from her family.  (R. 453).  Dr. Swanner also assessed the claimant as having a GAF score of 55, indicating moderate symptoms or moderate difficulty in social or occupational functioning.  (R. 34 n.2, 453).  The Sanctuary at the Woodlands discharged the claimant on March 11, 2013.  (R. 445, 461).

On March 20, 2013, the claimant appeared for a follow-up assessment at Mental Healthcare of Cullman.  Therapist Tommie Sanders assessed the claimant with a GAF score of 61, indicating some mild symptoms or some difficulty in social or occupational functioning.  (R. 34 n.3, 525).

On March 26, 2013, the claimant sought a psychological evaluation from Dr. Alan D. Blotcky at the request of her attorney.  (R. 502).  Dr. Blotcky diagnosed the claimant with depressive disorder, mild mental retardation, and a GAF of 44, indicating serious symptoms or any serious impairment in social or occupational functioning.  (R. 34 n.4, 504).  He administered the WAIS-IV test that resulted in a Full Scale IQ of 59.  (R. 503).  Dr. Blotcky recommended that the claimant receive psychological treatment.  (R. 504).  He also stated that the claimant's prognosis was very poor because of her depression and mental retardation and that the claimant could not manage her own affairs.  (R. 504).  Dr. Blotcky assessed the claimant as having marked difficulty in responding appropriately to supervisors, coworkers, and customers.  (R. 505).  He also found that the claimant had marked difficulty in using judgement in simple work-related

decisions, dealing with change in work environment, carrying out simple instructions, and had extreme difficulty in maintaining attention, concentration, or pace for a period of two hours. (R. 505-506). In addition, Dr. Blotcky, noted that the claimant was motivated and that her test scores were valid. (R. 504).

On April 17, 2013, the claimant returned to Mental Healthcare of Cullman. Practitioner Jessie Land assessed the claimant with a GAF score of 55, indicating moderate symptoms or moderate difficulty in social or occupational functioning. (R. 34 n.2, 516). Land noted that the claimant had not been taking her medication as prescribed. (R. 509).

*The ALJ Hearing*

At the hearing on July 1, 2013, the claimant testified that her major problems are the injuries from her wreck. She indicated that she struggles with pain in her neck, back, left side, and right knee from the wreck. (R. 48).

The claimant testified that tenth grade was the last grade she completed in school. (R. 47). She also stated that she was "special ed all through school," that she was special education in elementary school, and that she was held back in first grade. (R. 47).

Regarding her neck, the claimant stated she has difficulty turning it and that "it hurts every day." (R. 48). The claimant also indicated that her left side often goes numb and that it hurts when she moves her left arm or leg when they are numb. She stated that she loses her balance "a lot" because of the numbness and that she also falls down sometimes. (R. 49). The claimant also indicated that she tore ligaments in her right knee during the wreck, which has caused trouble walking and standing in one place. (R. 50).

The claimant testified that her pancreatitis causes acid reflux that makes her feel sick all

the time.  (R. 54, 55).  She also stated that she has headaches about twice a week that cause her to stay in a dark room and has problems sleeping.  (R. 55).

Regarding the effects of the physical limitations, the claimant testified that she can stand for "about ten minutes at the most."  (R. 50).  She also indicated that five to ten minutes is the longest that she can wash dishes without taking a break.  (R. 54).  The claimant said she could only sit for about ten minutes.  (R. 59).  The ALJ offered to allow the claimant to stand during the hearing if she needed to.  The claimant also testified that she could only lift about five pounds.  The ALJ then commented that she did not see anything that supports the claimant's testimony regarding her physical limitations.  (R. 60).

The claimant also testified to mental limitations.  She indicated that she has had a lot of stress from going through her divorce; a history of family problems; and difficulty getting along with people.  (R. 50).  The claimant testified that she has a history of depression and anxiety and that she had been hospitalized for mental problems in 2008, before the accident.  She indicated that she was prescribed Zoloft in 2008, which caused her to start seeing or imagining things that were not real, such as her husband beating her up, light fixtures talking, and her husband lying on the floor with another woman.  (R. 52).  The claimant indicated that she currently hears and sees things.  She testified that she sees a vision of a person without a face that she does not understand.  She also stated that she hears voices like women talking to her.  (R. 53).

Regarding her issues with relationships, the claimant testified that she has always had issues getting along with her mother, especially after her mother "flipped out" and "tried to kill herself" after the claimant's brother committed suicide.  (R. 53).

Regarding her depression, the claimant testified that she does not like traveling outside of

13

the house.  (R. 53).  She expressed that she had difficulty attending the hearing.  (R. 54).  The

claimant indicated a diagnosis of PTSD after the accident and her brother's suicide.  (R. 55).  The

claimant testified that she was going to mental health on a regular basis and was currently taking

Seroquel, Celexa, and Vistaril.  (R. 56).

A vocational expert, Ms. Melissa Neal, testified concerning the classification of the

claimant's  work and the ability of someone with the claimant's limitations to perform that work

or other work. She indicated that the claimant's work as a waitress was light and semi-skilled.

Ms. Neal stated that the claimant's previous occupations as a fast food worker and cashier were

light and unskilled.  (R. 64).

The ALJ asked Ms. Neal to assume an individual of the claimant's age with the residual

functional capacity to perform the light range of work: "Lifting and carrying 20 pounds

occasionally, 10 pounds frequently; standing and walking six [hours]; sitting for six hours; would

need a sit-stand option on the half hour."  (R. 64).  The ALJ further posited that the proposed

individual could not work in an occupation that required close cooperation or interaction with co-

workers.  Ms. Neal indicated that she did not believe that the proposed individual would be able

to perform the claimant's past work.  (R. 64-65).  The ALJ asked whether work would be

available for the proposed individual.  Ms. Neal indicated that she thought other light work was

available, such as a marker, with approximately 2,100 jobs in Alabama and 150,000 in the

United States, or a machine operator, with approximately 200 jobs in Alabama and 8,000 in the

United States.  (R. 65).  Ms. Neal also indicated that sedentary work was available, such as a

surveillance system monitor, with approximately 200 jobs in Alabama and 10,000 in the United

States; a document preparer, with approximately 300 jobs in Alabama and 21,000 in the United

14

states; or a table worker, with approximately 300 jobs in Alabama and 10,000 in the United States.  (R. 66).

The ALJ then asked Ms. Neal to assume the same hypothetical individual with the ability to respond appropriately to others one third of the time.  Ms. Neal stated that she did not believe any work was available for the proposed person.  (R. 66-67).  The ALJ then asked Ms. Neal to assume that the first hypothetical individual "could frequently move her head side to side and up and down."  Ms. Neal stated that she believed that the same jobs would be available as she had previously testified.  (R. 67).

The claimant's attorney then asked Ms. Neal to assume that the first hypothetical individual had "numbness and weakness in her left side and ... could only occasionally use her left hand."  (R. 67-68).  Ms. Neal stated that surveillance system monitor would be the only job left.  (R. 68).  The claimant's attorney then asked Ms. Neal to assume that the hypothetical individual was only able to occasionally focus and concentrate.  Ms. Neal stated that no work was available for that hypothetical individual.  Ms. Neal also indicated that a hypothetical individual who needed a sit-stand option every 10-15 minutes would have no work available.  (R. 69-70).  The claimant's attorney asked Ms. Neal to assume a person who had to be off task fifteen percent of the time.  Ms. Neal stated no work was available for that hypothetical individual.  (R. 71).

*The ALJ Decision*

On August 26, 2013, the ALJ determined that the claimant was not disabled under the Social Security Act.  (R. 38).  The ALJ found that the claimant had not engaged in substantial gainful activity since the application date.  (R. 28).

The ALJ found that the claimant suffered from severe impairments of degenerative disc disease of the cervical and lumbar spine, pancreatitis, leukocytosis, PTSD, anxiety, and depression.  The ALJ found that the claimant's neck, back, and knee injuries from the February 14, 2011 auto accident, cysts in breasts, learning disability, and obesity were non-severe because the state agency doctor did not indicate limitations from these impairments and the record did not indicate anything more than conservative treatment for the impairments.  (R. 28)  She found that none of the claimant's impairments, singly or in combination, manifested the specific signs and diagnostic findings required by the Listing of Impairments.  (R. 29)  The ALJ also found that the claimant could not perform any past relevant work.  (R. 36)  Consequently, the ALJ concluded that the claimant had the residual functional capacity to perform a range of light work.  (R. 31).

To support her conclusion, the ALJ noted that a nerve study on the claimant's degenerative disc showed no evidence of "peripheral neuropathy in the bilateral upper or lower extremities."  (R. 32)  The ALJ also noted no evidence of nerve root impingement in the MRI of the lumbar spine and no abnormal signal intensity regarding the disc protrusion in the claimant's cervical spine.  (R. 32).

The ALJ also noted Dr. Victor DeLoach's finding that the claimant had a reduced range of motion in the cervical and lumbar spine and pain during leg raises.  The ALJ also noted Dr. DeLoach's observation that the claimant had normal ambulation; was able to get on and off the exam table without difficulty; was able to dress and undress without problems; and "was able to do a one-third squat, walk on her heels, walk on her toes, and walk heel-to-toe."  (R. 32).

In considering the claimant's neck and back pain, the ALJ referred to Ms. Boatwright's assessment note at The Sanctuary at the Woodlands of "no grimacing and no physical signs or

symptoms of pain" during a physical exam where the claimant testified that her chronic neck and back pain was a ten out of ten.  (R. 33).

Regarding the claimant's mental impairments, the ALJ found that "most of her problems are situational and significantly improve with treatment."  The ALJ considered Dr. Haney's diagnoses of "major depressive disorder, recurrent, moderate with suicidal ideation and personality disorder not otherwise specified by history."  The ALJ also considered Dr. Haney's opinion that the claimant's ability to function in most jobs was severely impaired.  Additionally, the ALJ noted that Dr. Haney stated that the claimant "had not had any treatment in over one year."  (R. 33).

The ALJ also noted that the claimant stated she took special education classes, but the ALJ noted "no record of special education classes."  (R. 28).  The ALJ also noted that the claimant stated that she dropped out of school because she was tired of going.  The ALJ found the learning disability to be a non-severe impairment.  (R. 28).

The ALJ also analyzed the claimant under Listing 12.04 and 12.06.  (R. 29).  The ALJ considered that the claimant's depression, anxiety, and PTSD result in "no more than moderate restriction in ... daily living; moderate difficulties in ... social functioning, moderate difficulties in maintaining concentration, and no episodes of decompensation."  (R. 29-30).  She found that the claimant did not satisfy the "paragraph C" criteria.  (R. 30).

In considering the claimant's mental limitations, the ALJ also looked to the psychological evaluations of March 2013 from The Sanctuary at the Woodlands.  The ALJ noted that the claimant received a diagnosis of adjustment disorder with depressed mood and a GAF assessment of 30 upon admission.  (R. 33, *see* 33 n.1).  The ALJ pointed to the claimant's

17

improved GAF score of 55 at discharge after being treated with antidepressant and antipsychotic medications and group therapy.  (R. 34, *see* 34 n.2).  The ALJ also noted that the claimant received a GAF score of 61 on a follow-up visit a week later.  (R. 34, *see* 34 n.3).

The ALJ also addressed Dr. Blotcky's March 26, 2013 psychological evaluation.  She noted that the claimant's Wechsler Adult Intelligence Scale, Fourth Edition test scores placed her in the Mildly Retarded range.  (R. 34).  The ALJ noted Dr. Blotcky's assessment of a GAF of 44 in his April 12, 2013 report.  (R. 34, *see* 34 n.4).  She also noted Dr. Blotcky's assessment that the claimant had a marked limitation in the ability to respond appropriately to supervisors, coworkers, and the public; a marked limitation in using judgment in the work place and remembering and carrying out small tasks; and an extreme limitation in maintaining concentration, perseverance, or pace for periods of two hours.  (R.34-35).

The ALJ gave Dr. Blotcky's findings and conclusions "some weight."  (R. 35).  The ALJ specifically noted that Dr. Blotcky's assessment came only two weeks after the claimant had been in the hospital.  She reasoned that the GAF scores could have been appropriate at that time but noted that GAF scores are only a "snapshot" of a claimant's functioning at that time.  (R. 35).  The ALJ also noted that GAF scores are "not intended for forensic purposes" and that the Commissioner has indicated that GAF scores have no "direct correlation to the severity requirements [of the] mental disorders listings."  (R. 35).  The ALJ stated that Dr. Blotcky's evaluation "relied heavily on the claimant's subjective reporting."  (R. 35).  The ALJ also noted that the claimant sought Dr. Blotcky's evaluation through attorney referral to generate evidence for appeal and not to seek treatment for symptoms.  (R 35).  The ALJ found that "[a]lthough such evidence is certainly legitimate and deserves due consideration, the context in which it was

produced cannot be entirely ignored." (R. 35).

The ALJ also considered the psychological assessment of Jessie Land from April 17, 2013, where the claimant reported that she had not been taking her medication as prescribed and she received a GAF score of 55. (R. 34, *see* 34 n.2).

The ALJ indicated that she accorded some weight to Dr. Estock's psychological consultant opinion because he was familiar with the rules and regulations and his opinion was consistent with the record. (R. 35).

The ALJ found that the claimant's impairments supported by the medical records could be reasonably expected to cause the symptoms claimed by the claimant; however, the record did not support the degree and persistence of the effects. The ALJ noted that the claimant ambulated effectively despite her reduced range of motion in her spine. The ALJ also noted that the claimant only experienced pain from pancreatitis when she did not take medication. Additionally, the ALJ noted that the claimant rarely sought mental health treatment and that she was stable after receiving treatment in March. The ALJ also noted that the claimant admitted to "noncompliance with prescribed medication" and reasoned that this could indicate that "her symptoms may not be as severe as alleged." (R. 36).

After assessing the claimant's Residual Functioning Capacity, education, and work experience, the ALJ found that jobs exist in significant numbers that the claimant can perform. The ALJ referenced the analysis of the vocational expert who stated that an individual with the claimant's age, education, work experience, and residual functional capacity could work as a marker, machine operator, surveillance systems monitor, document preparer, and table worker. In conclusion, the ALJ found that the claimant had not been under a disability since September

24, 2012, the date of application for disability.  (R. 37-38).

## VI. Discussion

*The ALJ erred as a matter of law in failing to assess whether the claimant meets Listing 12.05 in light of the claimant's full scale IQ score of 59.*

The ALJ erred in failing to mention or consider Listing 12.05, considering that Dr. Blotcky assessed the claimant with a full scale IQ score of 59.  Not only did the ALJ fail to consider whether the claimant met Listing 12.05, but she failed to even mention or acknowledge the score.

The Eleventh Circuit has determined that for a claimant to be disabled under 12.05, the claimant must have significantly sub-average general intellectually functioning, deficits in adaptive behavior, and have manifested deficits in adaptive behavior before age twenty-two.  The claimant can also meet the criteria for presumptive disability in two ways.  Under 12.05(B), the claimant meets presumptive disability with a valid IQ score of 59 or less.  Under 12.05(C), the claimant meets presumptive disability if she presents a valid IQ score of 60 through 70 with evidence of an additional mental or physical impairment that significantly affects her ability to work.  *Crayton v. Callahan*, 120 F.3d 1217, 1219-20 (11th Cir.1997).

In the present case, the ALJ did not specifically mention the claimant's full scale IQ score of 59 in her decision.  The ALJ did, however, mention that the claimant's "Wechsler Adult Intelligence Scale, Fourth Edition test scores placed her in the Mildly Retarded range of intellectual disabilities."  However, the ALJ failed to acknowledge a 59 full scale IQ score or to analyze whether the claimant met Listing 12.05.  The ALJ did not explicitly discredit Dr. Blotcky's administration of the IQ test, and the record contains no evidence of another IQ test

20

that the ALJ could have considered.

The ALJ gave Dr. Blotcky's opinion "some weight" but failed to specifically address the IQ score. The ALJ listed multiple reasons for giving Dr. Blotcky's *general* findings less weight: that Dr. Blotcky saw the claimant two weeks after her stay at The Sanctuary at the Woodlands while she was still recovering from the events that led to her treatment; that the claimant sought the examination because of her attorney referral to generate evidence for appeal; and that Dr. Blotcky seemed to rely on the claimant's subjective report. However, none of these reasons support discrediting or disregarding the IQ score.

The ALJ indicated that the time frame of Dr. Blotcky's examination of the claimant affected the GAF score and other functioning assessments, but gave no analysis about how that timing negated or discredited the IQ test. An IQ test is an objective test, while a GAF score is a subjective assessment made by the physician. Also, although the claimant's lawyer may have referred her to Dr. Blotcky, he is a licensed psychologist, and no other psychological examination exists in the record to contradict the full scale IQ score of 59. Dr. Blotcky stated specifically that the claimant was motivated  during the exam and her test scores are valid. (R. 504).

The ALJ did not specifically explain how the full scale IQ score of 59 was invalid. But she did note "no record of special education" existed. (R. 28). However, the record does not support that finding. The ALJ failed to note the "Ind" designation for the claimant's Math, Science, English, and Social Studies courses from her high school permanent record and Withdrawal Report. (R. 423). Her permanent record also indicates the "Ind" designation for her Math, English, Alabama History, and Life Science classes in ninth grade. Although the Cullman City School System indicated it could find no Special Education Records for the claimant, the

21

"Ind" designation for her classes could indicate some form of recognized intellectual disability or special education class. The memo from the Cullman City School System was dated twenty-one years after the claimant attended school as late as 1991, and the lack of records in 2013 does not conclusively prove that those records never existed in 1991. The claimant testified that she took special education classes throughout her time in school and that she only completed tenth grade. Moreover, the record shows her grades during the 1989-1990 school year were extremely poor.

The ALJ considered whether the claimant met the listing impairments regarding mental health, § 12.04 and § 12.06, but did not even mention whether the claimant met § 12.05. (R. 29). If the plaintiff's full scale IQ score of 59 is valid, then the claimant meets Listing 12.05 (B) for presumptive disability. The presence of a slightly higher IQ score could also meet 12.05 (C) by virtue of the other severe impairments. The ALJ found that the claimant suffered from *six* severe impairments, which could satisfy the second prong of 12.05 (C) that requires "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *See Roberts v. Astrue*, No. CV 111-154, 2012 WL 4897443, at *4 (S.D. Ga. Sept. 20, 2012).

The court recognizes that a valid IQ score does not mean that conclusive evidence of mental retardation exists; however the ALJ must address the validity of an IQ score. *See Thomas v. Barnhart*, Case No. 04-12214, 2004 WL 3366150 (11th Cir. Dec. 7, 2004). In light of the ALJ's failure to explicitly address the evidence in the record of the plaintiff's possible mental retardation, the court concludes that the ALJ committed reversible error in failing to consider whether the claimant met Listing 12.05.

## VII. Conclusion

For the reasons as stated, this court concludes that the ALJ erred in failing to address

22

Listing 12.05 regarding the claimant's mental limitations and finds that this action is due to be REVERSED and REMANDED to the Commissioner.  The court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 9th day of September, 2016.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE